## HYATT v. HYSTER CO.

United States District Court
S. D. New York.
June 6, 1952.

Rose Lehman Stein, New York City, Harry A. Gair, Benjamin H. Siff, New York City, of counsel, for plaintiff.

Bigham, Englar, Jones & Houston, New York City, John M. Aherne, John J. Martin, New York City, of counsel, for defendant.

MURPHY, District Judge.

These are motions made by defendant (1) at the close of all evidence to strike out testimony of an expert witness for plaintiff and to direct a verdict for defendant upon which the court reserved decision, and (2) after verdict by a jury for plaintiff to set aside that verdict and grant a new trial.

The tragedy that gave rise to this action in tort against defendant, a manufacturer of motorized materials handling equipment, by plaintiff, a mechanic, happened in the City of New York on February 29, 1948. A unit of such equipment manufactured and assembled by defendant, the Karry-Krane KB 532, while being towed by another vehicle, toppled over sideways and crushed its driver, the plaintiff. His injuries had been so severe as to necessitate amputation of an arm and leg. There has been no objection that the amount of damages awarded the plaintiff is excessive. The only questions raised relate to the fault and liability of defendant. It is plaintiff's claim, asserted in this court on the basis of diversity of citizenship, that this fault and liability is grounded on the unsafe design with respect to stability embodied in the crane by the defendant manufacturer. Because defendant's motions raise questions of sufficiency of evidence as well as ones of substantive tort law, proof at trial is summarized.

At the time of the accident, the plaintiff, then 26 years old, was employed by McGrath Stevedoring Company as general mechanic for about a month. Previously, he had worked as general mechanic for another stevedoring company for about two years. Only during his employment with the McGrath firm did he have his first experience with defendant's crane. Plaintiff testified that in the 32 days in McGrath's employ he did operate such a crane on the pier or in the repair shop, but could not specify the number of times. While employed by the prior stevedoring company, plaintiff said he operated rear-wheel-steering vehicles but not the Hyster crane of defendant's manufacture. He also testified that while with McGrath he steered a Hyster crane under tow on two occasions, only one of which he could recall. During his service in the Navy he had worked on submarine Diesel engines.

On the day before the accident plaintiff was told to report to the New Jersey office of his employer. From there he was directed to Pier 84 on the North River where he met Mr. Mozian, a fellow employee. Mozian told him that they were going to take the KB crane #532 involved in this case to Pier 45. The crane was pushed into the street by another vehicle called a hilo but it was found that the blades in front of the hilo would not hold steadily to the rear of the Hyster crane. The Hyster crane was therefore placed in tow, this by attaching a cargo sling to the front of the crane and to the V frame on the hilo. There has been testimony that this was the usual way to tow such a crane.

Plaintiff testified that he mounted the crane and started to steer it along the cobblestone road of 12th Avenue in the City of New York as the hilo pulled it. His testimony is that the crane had a rocking motion while in tow and just prior to the accident. Near 35th Street, scene of the accident, the crane rocked a number of times from right to left and the right wheel came off the ground. He testified that the last four rockings occurred in quick succession within a space equal to a length or two of the crane. On the third of the four rockings, the plaintiff testified, the front left wheel rose higher off the ground than during the two prior ones. He thought this wheel rose four to five inches. He tried to jump off from the right side but was prevented by the gears. He shouted to Mozian, driver of the hilo,

and jumped to his left. He himself has no recollection of the impact but there is other testimony that he was found beneath the juncture of the boom and the mast of this particular crane. According to plaintiff, at the time of the accident the crane was three or four feet east of the fence which runs along the westerly side of 12th Avenue. He described the road surface of 12th Avenue as containing depressions and rolls and said that the surface between 35th and 36th Streets was fairly level, with some raised and depressed places. He testified that the cargo sling or tow rope was about twelve or fifteen feet long and taut and that they were proceeding about five miles an hour.

The remaining evidence concerns three important matters affecting defendant's liability: the condition of the road on 12th Avenue; the question of tipping in the light of experience with such a machine; and expert opinion on why the machine tipped or why it could not tip under these circumstances.

With respect to the condition of the road on the day of the accident four years ago, in addition to plaintiff's testimony, Mozian, driver of the hilo, testified that the road was very rough, with bumps and holes. In a statement that Mozian signed shortly after the accident he said that there were neither ruts nor holes in the road nor any objects on its surface. In explanation of that statement Mozian testified that the statement was true because there were no large holes. Mr. Caufield, in charge of maintenance for McGrath, called as witness by defendant, testified that he examined the road after the accident and found nothing out of the ordinary, although in examination before trial he said it was a bumpy road. Mr. McCarthy from the Manhattan Borough President's Office, called by defendant, said that his office had no record of any repairs since the date of the accident and the street was relatively in the same condition as it had been on that day; that it had no holes, ruts or depressions and no blocks are higher than 1½ inches or 2 inches above another and none 4 inches higher. He testified that the road was laid in 1930 with a concrete base and

granite blocks with tar between them placed upon sand covering this base. The only work on 12th Avenue, according to his records, was done in 1938 when some car tracks between 35th and 37th Streets were removed.

With respect to proof relating to tipping, Mozian testified that this same crane had tipped before when it was carrying, in conjunction with a hilo, a Mack truck and had been making a turn on a stringpiece. Mr. Caufield, called by defendant, testified on direct examination that he did not know of any tipping of a Karry-Krane without cargo in his six years' experience with McGrath. On cross-examination he said that he had heard of several instances of such tipping when the crane was not carrying a draft and recalled a particular one in New Jersey but had never heard of such tipping on 12th Avenue on level ground. Another witness, Baumann, testified that McGrath never had any trouble as far as stability of this machine was concerned and never heard of such crane tipping over on 12th Avenue going between five and six miles an hour. Mr. Hill, General Sales Manager for defendant, testified that he has never received a complaint on the lack of stability, although defendant has manufactured some 4,000 similar machines and 445 cranes identical to the one involved in this case. There is uncontradicted testimony that this particular crane was sold to the United States government in 1943, shipped abroad and returned to this country in February, 1946. Thereafter it was sold to the A & A Machinery Company and by them to McGrath in 1947 where it was almost in daily use up to the day of the accident.

Three experts were called: Mr. O'Connell, on behalf of the plaintiff; Mr. Fletcher and Mr. DenHartog for defendant. None of these experts had anything to do with design or manufacture of the crane in question. There were several conflicts in their testimony concerning the crane in question. Briefly described, this Karry Krane, Model KB #532, consists of a fixed boom adjustable only on the vertical plane and supported by an "A frame" mounted over a front axle which has four wheels. The machine tapers considerably to the

rear which is supported by a narrower two-wheeled axle. A counterweight is mounted in the rear to counterbalance weights lifted by the boom in the front. Steering is accomplished by a trunnion arrangement at the rear wheels which gives the vehicle maneuverability to turn within its own length.

As to the mass of the counterweight attached to the rear of the crane in question, Mr. O'Connell said that he took certain measurements of the crane involved in July, 1948, and estimated its weight to be 5,490 lbs. Mr. Fletcher, using figures from a blueprint of the counterweight dated September, 1951, estimated its weight at 4,290 lbs. The defendant, by introducing 20 invoices from the foundry which manufactured them, also attempted to prove that the counterweight weighed 4,320 lbs., or according to a blueprint in evidence, an estimated 4,300 lbs.

As to the physical dimensions of certain parts of the crane, Mr. O'Connell testified that he found the distance between the center of the outside front wheel on the left to the center of the outside front wheel on the right was 4 feet 10 inches and the same distance for the rear wheels was 1 foot 8 inches. Mr. Fletcher testified that he also took these measurements and found them to be 5 feet 8½ inches and 1 foot 1¾ inches respectively. Plaintiff conceded that Mr. Fletcher's measurements were correct.

As to the location of the center of gravity of the machine, Mr. O'Connell testified that it was located 4 feet from the ground and 5.06 feet behind the front axle. Mr. Fletcher stated that from his examination of the crane his opinion was that the center of gravity was 36.6 inches off the ground and 60.5 inches to the rear of the front axle.

A sharp conflict in expert testimony developed over calculation of the propensity of the crane involved to overturn sideways. The base of the crane assumes the shape of a truncated isosceles triangle, with base in front and truncated apex in the rear. The moment of resistance of the machine to lateral tipping could be computed mathematically, according to plaintiff's expert, Mr. O'Connell, when its weight is multi-plied by a lineal distance called a tipping arm or tipping distance. This tipping arm consists of an imaginary line drawn perpendicularly from another equally imaginary line representing one side of the triangular base of the machine, to a point directly below the center of gravity of the machine. The longer this line, the greater would be the stability of the machine, according to Mr. O'Connell. His trigonometric calculation of it was .77 feet, based on his concededly erroneous measurements of the machine. Defendant's expert, Mr. Fletcher, testified that—based on the same erroneous measurement—the correct calculation of this distance was 1.59 feet, or more than twice as long. Fletcher also offered a scale drawing and an actual-size reproduction on a huge sheet of wrapping paper of the erroneous dimensions of the machine to demonstrate that his calculation of this distance was right and Mr. O'Connell's wrong. There was no evidence as to what the calculation of this distance would be under the concededly correct dimensions taken by Mr. Fletcher.

Three different figures on the tipping angle of the machine were supplied by the three experts. Plaintiff's Mr. O'Connell placed this angle at about 11 degrees which would cause the opposite wheels to rise about 10½ inches. Defendant's Messrs. Fletcher and DenHartog fixed it respectively at 27.3 degrees (causing opposite wheel elevation of 30 inches) and 30 degrees.

Finally, with respect to a hypothetical question as to the competent producing cause of the accident under the circumstances set forth in evidence, Mr. O'Connell explained that it was the unevenness and depressions in the roadway occurring in such a manner that their effects added instead of cancelling thus accelerating the motion of the counterweight which turned the entire machine over. The weight of the machine according to his testimony, was insufficient to prevent the overturning because of its high center of gravity and the fact that the tipping axis was an oblique line from the outer front wheel to the outer rear one, this obliqueness reducing resistance to overturning which the machine

normally would have by 70 per cent. Answering a substantially similar question posed by defendant, Mr. DenHartog stated that the machine could not tip under those circumstances.

On certain points however there was no conflict in expert testimony. Plaintiff's expert Mr. O'Connell listed these defects in design which diminished resistance to overturning sideways: (1) The machine was so designed that without the counterweight about nine times as much of its weight was carried by its front wheels than by its rear ones. (2) The counterweight, which represented almost half of the weight of the entire machine (11,700 lbs.) was attached in such a manner as to cause it to oscillate when the crane moved. This was so because the counterweight was not supported from directly beneath but bolted to a vertical plate which was solidly welded to the chassis only at its bottom. Moreover the counterweight was so suspended that 90 per cent of its mass lay outside its support at the rear wheels instead of the support being outside the mass which safe design from the viewpoint of stability would require. (3) A safe center of gravity for the entire machine would be not more than two feet from the ground, whereas it was much higher in the machine as designed. (4) The location of the counterweight in the rear was such as not to lower the high center of gravity of the machine to make it safe against sidewise overturning. (5) The attachment and location of the counterweight could have been effected so as to afford greater stability without sacrificing maneuverability. (6) The oblique "tipping axis" or triangular shape of the base of the machine substantially reduced resistance to overturning sideways when compared with a rectangular shaped base.

Defendant did not call as witnesses the engineers responsible for the machine's design. Nor did defendant's two experts contradict this testimony of plaintiff's expert. Defendant exhibited motion pictures of tests made of the machine in question both on the roadway at the scene of the accident and elsewhere. These tests were made with wedge-shaped blocks of wood of two sizes, some purporting to be 4 inches at their highest point as they lay flat and the others 2 inches. The tests were run with the blocks placed alternately 8.8 feet apart in two lanes so that each front wheel would mount one every 4.4 feet. The vehicle did not overturn and the maximum swing reported was 10.2 degrees.

Reserving decision on motions by defendant, the court left the question of fault to the jury, specifying for their determination these three issues of fact:

First: Did defendant, The Hyster Company, fail to exercise reasonable care in the adoption of a formula or plan for the manufacture of the KB–532 crane, which plan, if properly followed, would produce a crane safe for the use for which it was sold, and which crane, unless carefully made, defendant should have recognized as involving an unreasonable risk of causing substantial bodily harm to a person who lawfully used it for a purpose for which it was manufactured and to a person who might be expected to be in the vicinity of its probable use?

Second: Only if you find that defendant did fail to exercise reasonable care in its adoption of a plan or formula under the first issue of fact, may you decide this second issue, namely, was this failure by defendant the proximate cause of plaintiff's injuries?

Third: Only if you find for the plaintiff and against the defendant on both the first and second issues of fact, may you decide this third issue of fact, namely, what amount of money will fairly and justly compensate the plaintiff for his injuries?

After deliberating more than five hours, the jury returned a verdict for plaintiff and awarded him $165,000 in damages.

■ The first motion of defendant is to strike out all of the testimony of Mr. O'Connell, plaintiff's expert, on the grounds that on cross-examination he erroneously calculated the tipping arm or distance of the machine at .77 feet whereas the correct calculation on the basis of his measurements was 1.59 feet. It may be conceded *arguendo* that the latter calculation based on Mr. O'Connell's measurements was the correct one. It may be assumed further

that mathematical situations—being conceptual, two-dimensional and based on axioms—are ones in which certainty of a logical sort is readily attainable. Unlike everyday three-dimensional situations of a non-conceptual, existential order in which certainty is unattainable, it may be that trigonometric calculations are not matters about which reasonable men may differ. Yet at the outset it should be pointed out that both the correct and incorrect calculations are based upon measurements conceded by both sides to be erroneous. The court could not then peremptorily charge the jury that the correct calculation of the tipping arm or distance of the machine involved was 1.59 feet and not .77 feet. No doubt an erroneous mathematical calculation by plaintiff's expert is a matter affecting his credibility. Testimony and exhibits by defendant's experts most emphatically called the jury's attention to the matter. In summation, counsel for defendant urged the jury to reject all of Mr. O'Connell's testimony on the theory that an error in one respect made it wrong in all respects. The court, it is felt, properly left the question of credibility of all of the witness' testimony to the jury with the instruction: "If you find that a witness testified falsely to a material fact you may disregard all of his testimony or you may disregard the part that you do not believe and accept the rest which you do believe."

The ultimate proposition of fault, a three-dimensional, existential and not a mathematical one, was supported by considerable testimony of plaintiff's expert quite independent of any erroneous calculation of a tipping arm or distance, such as testimony tending to establish an unsafe manner of attachment of the counterweight so as to cause it to oscillate, the unsafe manner of locating this weight, the unsafe center of gravity of the machine and the fact that greater stability could have been effected in design without unnecessarily sacrificing maneuverability. These matters, not susceptible to logical certainty, were not controverted by defendant's experts by mathematical or other proof. Under plaintiff's theory, the oscillation of the counterweight alone with certain acceleration of its disturbing force turned the machine over. While calculation of the tipping arm or distance would affect the amount of the disturbing force necessary for overturning, plaintiff's expert testified that no particular quantum of disturbing force was required "other than to get this thing in oscillation with a certain acceleration. Then the counterweight alone—its properties in that particular, acceleration of about 49 feet per second per second—would cause enough to tip this thing over."

Similarly the conceded error in measurement of the front and rear wheel spans by plaintiff's expert, while again a matter in the province of the jury with respect to its effect on the credibility of all of his testimony, was far from making the overturning a matter of physical impossibility and consequently a question about which reasonable men could not differ. Indeed, according to testimony of plaintiff's expert the machine was less stable under defendant's expert's concededly correct measurements than under his own erroneous ones. This was so because the obliqueness of the machine which reduced stability by 70 per cent according to plaintiff's expert's testimony and erroneous measurements, would be increased under defendant's correct ones. The existence of the requisite road conditions to oscillate the counterweight so as to overturn the machine was an issue of fact in the light of the testimony of all observers of the roadway and the criteria set forth by plaintiff's expert. Accordingly, the question of fault and weight of the testimony of plaintiff's expert were properly issues of fact within the province of the jury

Defendant insists that notwithstanding denial of its motion to strike all of plaintiff's expert's testimony, it is entitled to a directed verdict or an order setting aside the verdict rendered and granting a new trial on the grounds of the overwhelming weight of uncontradicted evidence. As has already been noted, much of the testimony of plaintiff's expert on negligent design embodied in the manufacture of the machine remained uncontradicted by defendant. Defendant failed to summon its engineers responsible for this de-

682

sign. While its experts testified that *a priori* on the basis of their calculations the machine could not have overturned under the uncontroverted circumstances *in* evidence, the unquestioned fact of the matter is that it did overturn. Accordingly, the question of defendant's fault was properly left to the jury with instructions on applicable standard of care which have long since been established. MacPherson v. Buick Motor Car Co., 217 N.Y. 382, 111 N.E. 1050, L.R.A.1916F, 696; Restatement of the Law of Torts §§ 395, Comment c, 398.

Motions to strike testimony of plaintiff's witness, direct verdict for defendant and set aside verdict and grant new trial are denied.